## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **WOMEN'S LIBERATION FRONT,** | |
| Plaintiff, | |
| v. | Case No. 1:16-cv-915-WPL-KBM |
| **UNITED STATES DEPARTMENT OF JUSTICE; LORETTA E. LYNCH, in her Official Capacity as Attorney General of the United States; VANITA GUPTA, in her Official Capacity as Principal Deputy Assistant Attorney General; UNITED STATES DEPARTMENT OF EDUCATION; JOHN B. KING, JR., in his Official Capacity as United States Secretary of Education,** | **DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS** |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITES ............................................................................................... ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ............................................................................................................ 3

STANDARD OF REVIEW ........................................................................................... 4

ARGUMENT ................................................................................................................ 5

   I.   The Court Lacks Authority to Consider Plaintiff's Challenges to the 2016 DCL ............. 5

     A.   Plaintiff Lacks Standing to Bring This Action ............................................. 5

     B.   Plaintiff Cannot Bring Suit Under the APA Because It Does Not Challenge  Any Final Agency Action ....................................................................... 10

     C.   Plaintiff's Action Is Not Ripe for Judicial Review ..................................... 12

   II.   Plaintiff's APA Claims Should Be Dismissed for Failure to State a Claim upon Which Relief May Be Granted ........................................................................... 15

     A.   Defendants' Interpretation Is Consistent with Title IX and Its Implementing Regulations ................................................................................ 16

        1.   Title IX and Its Regulations Are Silent as to How Transgender Students Should Be Assigned to Sex-Segregated Facilities ................................. 17

        2.   Defendants Reasonably Interpreted Title IX's Implementing Regulations Consistent with the Statute's Mandate of Equal Educational Opportunities ........... 21

     B.   The 2016 DCL Is An Interpretive Rule Exempt from Notice-and-Comment Rulemaking ................................................................................ 28

     C.   The 2016 DCL Does Not Conflict With New Mexico Criminal Law ...................... 30

   III.   The 2016 DCL Does Not Violate Students' Constitutional Right to Bodily Privacy ...... 31

CONCLUSION ............................................................................................................ 34

# TABLE OF AUTHORITES

**Cases**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ...................................................................................... 12, 13

*Abeyta by & through Martinez v. Chama Valley Indep. Sch. Dist., No. 19*,
   77 F.3d 1253 (10th Cir. 1996) .............................................................................. 34

*Almendarez-Torres v. United States*,
   523 U.S. 224 (1998) ........................................................................................... 20

*Am. Forest & Paper Ass'n v. U.S. E.P.A.*,
   154 F.3d 1155 (10th Cir. 1998) .............................................................................. 7

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
   995 F.2d 1106 (D.C. Cir. 1993) ............................................................................ 30

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................. 5

*AT&T Co. v. E.E.O.C.*,
   270 F.3d 973 (D.C. Cir. 2001) .............................................................................. 10

*Auer v. Robbins*,
   519 U.S. 452 (1997) ....................................................................................... 16, 21

*Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Ed.*,
   2016 WL 5372349 (S.D. Ohio Sept. 26, 2016) ............................................... passim

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................. 5

*Bennett v. Spear*,
   520 U.S. 154 (1997) ........................................................................................... 10

*Browder v. City of Albuquerque*,
   787 F.3d 1076 (10th Cir. 2015) .................................................................. 31, 32, 33

*Carcaño v. McCrory, No.*,
   1:16CV236, 2016 WL 4508192 (M.D.N.C. Aug. 26, 2016) ........................... passim

*Chasteen v. Black*,
   No. 14-CV-02235-BNB, 2014 WL 5448702 (D. Colo. Oct. 27, 2014) ................... 32

*Chavez v. Martinez*,
   538 U.S. 760 (2003) .................................................................................... 31, 33

*Christensen v. Cnty. of Boone*,
  483 F.3d 454 (7th Cir. 2007) ............................................................................ 33

*Christopher v. SmithKline Beecham Corp.*,
  132 S. Ct. 2156 (2012)....................................................................................... 22

*Citizen Ctr. v. Gessler*,
  770 F.3d 900 (10th Cir. 2014) ............................................................................. 8

*Collins v. Correct Care Sols., No. 11-3151-SAC*,
  2013 WL 2458502 (D. Kan. June 6, 2013)......................................................... 32

*Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*,
  220 F.3d 1171 (10th Cir. 2000) .......................................................................... 12

*COPE v. Kansas State Bd. of Educ.*,
  821 F.3d 1215 (10th Cir. 2016) ............................................................................ 8

*County of Sacramento v. Lewis*,
  523 U.S. 833 (1998)............................................................................................ 34

*Cox v. Denning*,
  No. 12-2571-DJW, 2014 WL 4843951 (D. Kan. Sept. 29, 2014) ....................... 32

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
  452 F.3d 798 (D.C. Cir. 2006) ............................................................................ 10

*Davis, Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999)...................................................................................... 19, 22

*Dismas Charities, Inc. v. U.S. Dep't of Justice*,
  401 F.3d 666 (6th Cir. 2005) .............................................................................. 29

*Does v. Munoz*,
  507 F.3d 961 (6th Cir. 2007) .............................................................................. 33

*E. Ky. Welfare Rights Org. v. Simon*,
  506 F.2d 1278 (D.C. Cir. 1974) .......................................................................... 29

*Etsitty v. Utah Transit Auth.*,
  502 F.3d 1215 (10th Cir. 2007) ..................................................... 15, 23, 24, 25

*Farrell-Cooper Min. Co. v. U.S. Dep't of the Interior*,
  728 F.3d 1229 (10th Cir. 2013) .......................................................................... 13

*Friends of Marolt Park v. U.S. Dep't of Transp.*,
  382 F.3d 1088 (10th Cir. 2004) ..................................................................... 13, 14

iii

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990) ................................................................................................... 7

*G.G. v. Gloucester Cnty. Sch. Bd.*,
No. 15-2056, 2015 WL 6585237 (4th Cir. 2015) ..................................................... 12

*G.G. v. Gloucester Cnty. Sch. Bd.*,
822 F.3d 709 (4th Cir. 2016) ........................................................................... passim

*Garcia v. Miera*,
817 F.2d 650 (10th Cir. 1987) .................................................................................. 34

*Gilliam v. USD No. 244 Sch. Dist.*,
397 F. Supp. 2d 1282 (D. Kan. 2005) ...................................................................... 34

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) ......................................................................... 25, 26

*Hayes v. Marriott*,
70 F.3d 1144 (10th Cir. 1995) .................................................................................. 32

*Hiatt v. Colo. Seminary*,
No. 15-cv-192, 2016 WL 1321511 (D. Colo. Apr. 5, 2016) ..................................... 24

*Hoctor v. USDA*,
82 F.3d 165 (7th Cir. 1996) ...................................................................................... 28

*Holloway v. Arthur Anderson & Co.*,
566 F.2d 659 (9th Cir. 1977) .................................................................................... 25

*Hunt v. Wash. State Apple Adver. Comm'n*,
432 U.S. 333 (1977) .................................................................................................... 5

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) .................................................................................. 11

*In re Dorchester Cnty. Sch. Dist. 2, SC*,
OCR Case No. 11-15-1348 (Jun. 16, 2016) ............................................................. 22

*Iowa League of Cities v. EPA*,
711 F.3d 844 (8th Cir. 2013) .................................................................................... 30

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005) .................................................................................................. 22

*Johnson v. Fresh Mark, Inc.*,
337 F. Supp. 2d 996 (N.D. Ohio 2003) ..................................................................... 18

*Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*,
    97 F. Supp. 3d 657 (W.D. Pa. 2015) ...................................................... 17

*Jones v. Harrison*,
    864 F. Supp. 166 (D. Kan. 1994) ............................................................ 32

*Koessel v. Sublette Cnty. Sheriff's Dep't*,
    717 F.3d 736 (10th Cir. 2013) ................................................................ 31

*Los Alamos Study Grp. v. Dep't of Energy*,
    692 F.3d 1057 (10th Cir. 2012) .............................................................. 13

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ......................................................................... 5, 6, 7

*Lusardi v. Dep't of the Army*,
    2015 WL 1607756 (E.E.O.C. Apr. 1, 2015) ........................................... 23

*Nat'l Commodity & Barter Ass'n v. Gibbs*,
    886 F.2d 1240 (10th Cir. 1989) ................................................................ 6

*Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*,
    764 F.3d 1199 (10th Cir. 2014) .............................................................. 20

*Nat'l Med. Enterprises, Inc. v. Shalala*,
    43 F.3d 691 (D.C. Cir. 1995) .................................................................. 28

*Nat'l Min. Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ................................................................ 11

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
    523 U.S. 726 (1998) ................................................................................ 12

*Oncale v. Sundowner Offshore Svcs., Inc.*,
    523 U.S. 75 (1998) ........................................................................... passim

*Park Lake Res. Liab. Co. v. U.S. Dep't of Agr.*,
    197 F.3d 448 (10th Cir. 1999) ................................................................ 13

*Pension Benefit Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990) ................................................................................ 20

*Perez v. Mortg. Bankers Ass'n*,
    135 S. Ct. 1199 (2015) ............................................................... 28, 29, 30

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) ............................................................... 24, 25, 26

*Radtke v. Misc. Drivers & Helpers Union Local No. 683 Health, Welfare, Eye & Dental Fund*,
  867 F. Supp. 2d 1023 (D. Minn. 2012) ...................................................................... 18

*Reno v. Flores*,
  507 U.S. 292 (1993) .................................................................................................. 32

*Rivera v. Bates*,
  No. CIV 12-0473 JB/RHS, 2014 WL 3421050 (D.N.M. June 21, 2014) ................... 32

*Roe No. 2 v. Ogden*,
  253 F.3d 1225 (10th Cir. 2001) ................................................................................ 13

*Rosa v. Park W. Bank & Trust Co.*,
  214 F.3d 213 (1st Cir. 2000) .................................................................................... 26

*S. Utah Wilderness All. v. Office of Surface Mining Reclamation & En't*,
  620 F.3d 1227 (10th Cir. 2010) .................................................................................. 5

*Sackett v. E.P.A.*,
  132 S. Ct. 1367 (2012) ........................................................................................ 10, 11

*Schroer v. Billington*,
  577 F. Supp. 2d 293 (D.D.C. 2008) .............................................................. 21, 26, 27

*Schwenk v. Hartford*,
  204 F.3d 1187 (9th Cir. 2000) ........................................................................ 25, 26, 27

*Seegmiller v. LaVerkin City*,
  528 F.3d 762 (10th Cir. 2008) ............................................................................ 31, 33

*Shalala v. Guernsey Mem'l Hosp.*,
  514 U.S. 87 (1995) .................................................................................................... 29

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) .................................................................................................. 23

*Smith v. City of Salem*,
  378 F.3d 566 (6th Cir. 2004) .......................................................................... 25, 26, 27

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001) .................................................................................................. 20

*Sommers v. Budget Marketing, Inc.*,
  667 F.2d 748 (8th Cir. 1982) .................................................................................... 25

*Sorenson Commc'ns, Inc. v. F.C.C.*,
  567 F.3d 1215 (10th Cir. 2009) ................................................................................ 28

*Student v. Arcadia Unified Sch. Dist., CA*,
  OCR Case No. 09-12-1020/DOJ Case Number 169-12C-70 (Jul. 24, 2013) .......................... 23

*Students & Parents for Privacy v. U.S. Dep't of Educ.*,
  No. 16-cv-4945 (Oct. 18, 2016), ................................................................................. 8

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ................................................................................................. 6

*Talk Am., Inc. v. Mich. Bell Tel. Co.*,
  564 U.S. 50 (2011) .................................................................................................. 21

*Texas v. United States*,
  523 U.S. 296 (1998) ............................................................................................ 12, 14

*Texas v. United States*,
  No. 7:16-cv-54, 2016 WL 4426495 (N.D. Tex. Aug. 21, 2016) ............................ 1, 17, 20, 21

*Thomas v. Union Carbide Agricultural Prods. Co.*,
  473 U.S. 568 (1985) ................................................................................................ 14

*Township High School Dist. 211, IL*,
  OCR Case No. 05-14-1055 (Dec. 3, 2015) ................................................................... 22

*Truckers United for Safety v. Fed. Highway Admin.*,
  139 F.3d 934 (D.C. Cir. 1998) .................................................................................. 14

*U.S. Army Corps of Engineers v. Hawkes Co.*,
  136 S. Ct. 1807 (2016) ......................................................................................... 10, 11

*Ulane v. Eastern Airlines, Inc.*,
  742 F.2d 1081 (7th Cir. 1984) .................................................................................. 25

*United States v. Rodriguez-Aguirre*,
  264 F.3d 1195 (10th Cir. 2001) .................................................................................. 4

*United States v. Se. Okla. State Univ.*,
  No. 15-324-c, 2015 WL 4606079 (W.D. Okla. July 10, 2015) ......................................... 24

*Utah Ass'n of Cntys. v. Bush*,
  455 F.3d 1094 (10th Cir. 2006) .................................................................................. 5

*Utah v. U.S. Dep't of Interior*,
  535 F.3d 1184 (10th Cir. 2008) ............................................................................. 13, 14

*W.N.J. v. Yocom*,
  257 F.3d 1171 (10th Cir. 2001) .................................................................................. 6

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ................................................................................ 31, 32

*Whitaker v. Kenosha Unified Sch. Dist. No. 1, No. 16-cv-943*,
    2016 WL 5239829 (E.D. Wisc. Sept. 22, 2016) .......................................... 17

*WildEarth Guardians v. U.S. Fish & Wildlife Serv.*,
    784 F.3d 677 (10th Cir. 2015) ..................................................................... 30

*WildEarth Guardians v. U.S. Forest Serv.*,
    828 F. Supp. 2d 1223 (D. Colo. 2011) ......................................................... 14

*Zablocki v. Redhail*,
    434 U.S. 374 (1978) ..................................................................................... 32

## Statutes

5 U.S.C. § 553(b)(3)(A) .................................................................................... 28

5 U.S.C. § 704 .................................................................................................. 10

5 U.S.C. § 706(2)(A) ........................................................................................ 16

5 U.S.C. § 706(2)(C) ........................................................................................ 30

20 U.S.C. § 1681 ................................................................................................. 3

20 U.S.C. § 1681(a) ............................................................................... 16, 17, 22

20 U.S.C. § 1682 ................................................................................................. 3

42 U.S.C. § 13925(b)(13)(A) ........................................................................... 20

42 U.S.C. § 2000e-2(a)(1) ................................................................................ 26

N.M.S. § 30-9-14 .............................................................................................. 31

N.M.S. § 30-9-20 .............................................................................................. 31

Violence Against Women Reauthorization Act of 2013 ("VAWA"),
    Pub. L. No. 113-4, 127 Stat. 61 (2013) ........................................................ 19

## Rules

Federal Rule of Civil Procedure 12(b)(1) .......................................................... 4

Federal Rule of Civil Procedure 12(b)(6) ........................................................ 15

Federal Rule of Civil Procedure 5.2(a)(3) .......................................................... 6

**Regulations**

28 C.F.R. pt. 54 ........................................................................................................ 3

28 C.F.R. § 54.400(b) .............................................................................................. 3

28 C.F.R. § 54.410 .................................................................................................. 3

34 C.F.R. pt. 106 ..................................................................................................... 3

34 C.F.R. § 106.31(b) ........................................................................................ 3, 22

34 C.F.R. § 106.33 ............................................................................ 3, 16, 17, 22

**Other Authorities**

Am. Heritage Dictionary (1973) ......................................................................... 18

Christine Michelle Duffy, *The Americans with Disabilities Act of 1990 and the
Rehabilitation Act of 1973*, *in* Gender Identity and Sexual Orientation
Discrimination in the Workplace: A Practical Guide,
(Christine Michelle Duffy ed. Bloomberg BNA 2014) .......................................... 19

E.S. Smith et al., *The Transexual Brain—A Review of Findings on the Neural
Basis of Transsexualism*, 59 Neuroscience and Biobehavioral
Reviews (Dec. 2015)............................................................................................. 19

Letter from Anurima Bhargava and Arthur Zeidman to Dr. Joel Shawn (July 24, 2013),
https://www.justice.gov/sites/default/files/crt/legacy/2013/07/26/arcadialetter.pdf ............... 11

Letter from Arthur Zeidman to Dr. John Garcia (Oct. 14, 2014),
https://www.ed.gov/documents/press-releases/downey-school-district-letter.pdf .................. 12

Letter from Catherine E. Lhamon, Assistant Secretary for Civil Rights, and Vanita Gupta,
Principal Deputy Assistant Attorney General for Civil Rights (May 13, 2016),
http://www.ed.gov/ocr/letters/colleague-201605-title-ix-transgender.pdf ................................ 3

May 2016 Dear Colleague Letter ("2016 DCL")................................................ passim

Memorandum from Attorney General Eric Holder (Dec. 15, 2014),
https://www.justice.gov/file/188671/download ...................................................... 21

U.S. Dep't of Educ., *Examples of Policies and Emerging Practices for Supporting
Transgender Students* (May 2016) ("*Emerging Practices*"),
http://www.ed.gov/oese/oshs/emergingpractices.pdf ....................................... 23, 25

U.S. Dep't of Educ., Office for Civil Rights, Sex Discrimination Policy Guidance,
https://www.ed.gov/ocr/frontpage/faq/rr/policyguidance/sex.html ........................................... 4

U.S. Dep't of Educ., Types of Guidance Documents,
  https://www.ed.gov/policy/gen/guid/types-of-guidance-documents.html ................................. 4

Webster's Third New Int'l Dictionary (1971) ............................................................... 18

Webster's Seventh New Collegiate Dictionary (1970) ................................................. 18

# INTRODUCTION

Plaintiff Women's Liberation Front brings this action against the U.S. Departments of Education ("ED") and Justice ("DOJ"), as well as the Secretary of Education, the Attorney General, and the Principal Deputy Assistant Attorney General, in their official capacities. Plaintiff seeks to invalidate Defendants' interpretation—as embodied in a May 2016 Dear Colleague Letter[1] (hereinafter the "2016 DCL") issued by ED and DOJ—that, under Title IX of the Education Amendments of 1972 ("Title IX") and its implementing regulations, schools must allow a transgender student to access the restrooms and other sex-segregated facilities that match the student's gender identity. Plaintiff states six claims for relief under the Administrative Procedure Act ("APA") and the Constitution, all of which fail.

As a threshold matter, Plaintiff lacks Article III standing to challenge the 2016 DCL, in which ED and DOJ have articulated their interpretation of Title IX and its implementing regulations, because the only alleged injuries that Plaintiff identifies are to two members who remain anonymous, in violation of the Federal Rules of Civil Procedure. And even if Plaintiff had leave to proceed pseudonymously, the alleged injuries are purely conjectural, as they are based on unfounded fears and a series of speculative events that may or may not occur. Furthermore, Plaintiff lacks statutory standing to proffer its APA claim because the challenged guidance document does not carry the type of legal consequences necessary to constitute final agency action. Instead, it merely informs the public about Defendants' interpretation of Title IX and its

---

[1] This document is the subject of a preliminary injunction in *Texas v. United States*, No. 7:16-cv-54, 2016 WL 4426495 (N.D. Tex. Aug. 21, 2016). For reasons explained *infra*, Defendants disagree with the *Texas* court's ruling and have filed a notice of appeal. In any event, the preliminary injunction, as recently clarified by the court, prohibits Defendants from "relying on the [2016 DCL]" in "pending litigation concerning access to intimate facilities" where "no responsive pleadings were filed and no substantive rulings issued before August 21, 2016." Order at 6 n.2, *Texas*, No. 7:16-cv-54 (N.D. Tex. Oct. 18, 2016). Defendants may, however, "offer textual analyses of Title IX . . . in cases where the Government and its agencies are defendants." *Id.* at 6. The *Texas* court's preliminary injunction appears to apply to this case, though Defendants believe that such a prohibition is improper because, *inter alia*, it extends to litigation that does not involve the *Texas* plaintiffs, thus depriving this Court of the benefit of a full development of competing legal positions. In an abundance of caution, however, Defendants are proceeding as though the preliminary injunction prohibits them from "relying on the [2016 DCL]" in this case.

regulations.  In fact, ED maintained and applied that interpretation before the challenged document was even issued.  For similar reasons, Plaintiff's claims are not ripe for judicial review.

Nor can Plaintiff succeed on its substantive and procedural APA claims, or its constitutional claim.  Defendants' interpretation is consistent with Title IX and its implementing regulations, as well as other statutory and constitutional commands.  Indeed, the only court of appeals to consider Defendants' interpretation has found it to be reasonable.  Plaintiff's allegations are predicated on the misguided notion that the protections against discrimination "on the basis of sex" as used in Title IX unambiguously encompasses protection against discrimination *only* on the basis of "one's genetic sex as determined by one's chromosomes, birth anatomy, gametes, and reproductive system."  Compl. at 3 n.1.  But this position runs counter to case law from the Supreme Court and numerous courts of appeals, which rejects a narrow interpretation of sex discrimination that would limit discrimination on the basis of "sex" to discrimination solely on the basis of genetic makeup or reproductive organs.  Indeed, many of those courts specifically recognize that discrimination against persons whose gender identity differs from their sex assigned at birth constitutes a form of sex discrimination.

Plaintiff's procedural APA claim fares no better, as the 2016 DCL is at most an interpretive rule that did not require notice-and-comment rulemaking.  The 2016 DCL is not itself necessary to sustain the validity of the interpretation that it sets forth.  Nor is there any merit to Plaintiff's claim that the 2016 DCL somehow nullifies New Mexico criminal laws pertaining to indecent exposure and voyeurism.  Those state laws continue to offer the same protection that they did prior to the issuance of the agencies' guidance.  Finally, Plaintiff fails to state a substantive due process claim under the Fifth and Fourteenth Amendments, as it has not identified any fundamental right that is violated by Defendants' actions.

For these reasons—articulated in more detail below—the Court should dismiss all of Plaintiff's claims and this case.

**BACKGROUND**

Title IX prohibits discrimination on the basis of sex in education programs and activities by recipients of federal financial assistance.  20 U.S.C. § 1681 *et seq*.  DOJ and ED share primary responsibility for enforcing Title IX and its implementing regulations.  *See* 20 U.S.C. § 1681; 34 C.F.R. pt. 106; 28 C.F.R. pt. 54.  Under this authority, ED investigates complaints and conducts compliance reviews, and ED and DOJ promulgate regulations and issue guidance to clarify how they interpret applicable statutory and regulatory obligations.  *See* 20 U.S.C. § 1682.  Consistent with the statute's anti-discrimination mandate, ED's and DOJ's regulations prohibit recipients from providing "different aid, benefits, or services," or "[o]therwise limit[ing] any person in the enjoyment of any right, privilege, advantage, or opportunity" on the basis of sex.  34 C.F.R. § 106.31(b); 28 C.F.R. § 54.400(b).  The regulations further explain that recipients may "provide separate toilet, locker room, and shower facilities on the basis of sex" without running afoul of Title IX, so long as the "facilities provided for students of one sex" are "comparable to [the] facilities provided for students of the other sex."  34 C.F.R. § 106.33; 28 C.F.R. § 54.410.

In response to requests for clarification from federal fund recipients, ED and DOJ have issued guidance that provides their interpretation of Title IX and its implementing regulations with respect to transgender individuals.  Plaintiff here challenges one such guidance document—a Dear Colleague Letter that was issued by the agencies on May 13, 2016, in which they explained that "[w]hen a school provides sex-segregated activities and facilities, transgender students must be allowed to participate in such activities and access such facilities consistent with their gender identity."  Letter from Catherine E. Lhamon, Assistant Secretary for Civil Rights, and Vanita Gupta, Principal Deputy Assistant Attorney General for Civil Rights (May 13, 2016), http://www.ed.gov/ocr/letters/colleague-201605-title-ix-transgender.pdf (last visited Oct. 11, 2016).  The 2016 DCL is not legally binding, and it does not expose any person or institution to new liabilities or legal requirements.  Rather, it simply provides the agencies' interpretation as to

3

what Title IX and its implementing regulations already require.  Guidance documents issued by ED "do not create or confer any rights for or on any person" and "do not impose any requirements beyond those required under applicable law and regulations."  U.S. Dep't of Educ., Types of Guidance Documents, https://www.ed.gov/policy/gen/guid/types-of-guidance-documents.html.[2] Indeed, the 2016 DCL is *explicit* in the fact that it does not carry the force of law.  *See* 2016 DCL at 1 ("This guidance does not add requirements to applicable law, but provides information and examples to inform recipients about how the Departments evaluate whether covered entities are complying with their legal obligations.").

On August 11, 2016, Plaintiff—an "unincorporated association of radical feminists dedicated to the total liberation of women fighting to, among other things, end male violence, regain reproductive sovereignty for women, and preserve women-only spaces," Compl. ¶ 1—filed this lawsuit.  Plaintiff contends that the 2016 DCL violates the APA, the Fifth Amendment, and the Fourteenth Amendment, and will force its members "to share with men restrooms, locker rooms, changing areas, and other private spaces that Congress mandated shall be exclusively for use by women."  *Id.*  Plaintiff seeks declaratory and injunctive relief.  *Id.* at 14–15.

## STANDARD OF REVIEW

Defendants move to dismiss Plaintiff's claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). Where, as here, a motion to dismiss for lack of jurisdiction under Rule 12(b)(1) is limited to a facial attack on the pleadings, it is subject to the same standard applied under Rule 12(b)(6).  *See United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001).

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege "enough facts

---

[2] ED has issued guidance documents for decades, across multiple administrations, in order to notify schools and other federal fund recipients of how the agency interprets the law and how it views new and emerging issues. *See, e.g.*, U.S. Dep't of Educ., Office for Civil Rights, Sex Discrimination Policy Guidance, https://www.ed.gov/ocr/frontpage/faq/rr/policyguidance/sex.html (describing the purpose of guidance documents and providing links to guidance documents back to 1975).

to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  Accordingly, allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* at 555.  And "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

## ARGUMENT

### I.     The Court Lacks Authority to Consider Plaintiff's Challenges to the 2016 DCL

### A.     Plaintiff Lacks Standing to Bring This Action

In order to establish standing, a plaintiff must demonstrate that it "ha[s] suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).  Plaintiff's claims fail as an initial matter because it cannot make such a showing.

Plaintiff does not assert that it has suffered any injury as a result of Defendants' actions— rather, Plaintiff relies on alleged injuries suffered by its members.  *See* Compl. ¶ 1 ("Defendants' actions injure WoLF because Defendants' policies will result in WoLF members having to share with men restrooms, locker rooms, changing areas, and other private spaces that Congress mandated shall be exclusively for use by women.").  Accordingly, Plaintiff can establish standing only if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Utah Ass'n of Cntys. v. Bush*, 455 F.3d 1094, 1099 (10th Cir. 2006) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342–43 (1977)).  In an APA action where, as here, an association's member "is not [herself] the object of the government action or inaction [s]he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *S. Utah Wilderness*

*All. v. Office of Surface Mining Reclamation & Enf't*, 620 F.3d 1227, 1233 (10th Cir. 2010) (quoting *Lujan*, 504 U.S. at 562).

Plaintiff identifies only two members who have allegedly suffered cognizable injuries-in-fact: A.B. and her mother. *See* Compl. ¶¶ 32, 38; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (organizational standing "require[s] plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm"). Those two members, however, cannot establish standing in their own right. As an initial matter, the Court lacks jurisdiction to consider their alleged injuries because the Court has not granted A.B. leave to proceed under a pseudonym, *see* Compl. at 9 n.2 ("'AB' are not her actual initials."), or A.B.'s mother leave to proceed anonymously. The Federal Rules "provide no exception that allows parties to proceed anonymously or under fictitious names such as initials."[3] *W.N.J. v. Yocom*, 257 F.3d 1171, 1172 (10th Cir. 2001). Rather, "[w]hen a party wishes to file a case anonymously or under a pseudonym, it must first petition the district court for permission to do so." *Id*. "Where no permission is granted, 'the federal courts lack jurisdiction over the unnamed parties, as a case has not been commenced with respect to them.'" *Id*. (quoting *Nat'l Commodity & Barter Ass'n v. Gibbs*, 886 F.2d 1240, 1245 (10th Cir. 1989) (per curiam)). Consequently, because Plaintiff identified its two members "us[ing] pseudonyms without first obtaining permission from the district court, the case was improperly filed and must be dismissed for lack of . . . jurisdiction." *Id*.

Moreover, even if the Court had jurisdiction to consider the alleged harms suffered by A.B. and her mother, they are purely speculative and thus do not constitute cognizable injuries-in-fact. Plaintiff avers that A.B.'s school and her mother's public university will "implement . . . or be ordered to implement" the 2016 DCL. Compl. ¶¶ 28, 35. Accordingly, Plaintiff argues that A.B.

---

[3] Even under Federal Rule of Civil Procedure 5.2(a)(3), a minor must be identified by "the minor's initials." A.B. is not, however, identified by her actual initials. Rather, Plaintiff used a pseudonym without prior leave of the Court.

and her mother fear that they will suffer "embarrassment, humiliation, anxiety, and loss of personal dignity" as a result of "shar[ing] . . . intimate spaces with men while in various stages of undress." *Id*. ¶ 39; *see also id*. ¶ 32.   Nowhere does Plaintiff allege, however, that any transgender students actually attend either A.B.'s school or her mother's university.   In the absence of any such suggestion, Plaintiff cannot demonstrate an "actual or imminent" risk that either A.B. or her mother will share a restroom or other facility with a transgender individual.   *Lujan*, 504 U.S. at 560; *see also Am. Forest & Paper Ass'n v. U.S. E.P.A*., 154 F.3d 1155, 1159 (10th Cir. 1998) ("It is a long-settled principle that standing cannot be inferred argumentatively from [the party's] averments . . . but rather must affirmatively appear in the record." (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990))).

Even assuming, *arguendo*, that transgender students do attend A.B.'s school or her mother's university, they cannot establish standing for multiple reasons.   First, it is entirely possible that those schools—either expressly or implicitly—*already* allowed transgender students to access facilities consistent with their gender identity prior to the issuance of the 2016 DCL, such that no injury is traceable to that guidance.   Second, even if that is not the case, Plaintiff's claim that the schools "will implement . . . or be ordered to implement" the 2016 DCL is pure conjecture, as Plaintiff offers no allegation that ED or DOJ has initiated any investigation or enforcement action against A.B.'s school or her mother's university based on the agencies' interpretation of Title IX.   Third, even if the schools choose to permit transgender students to access facilities consistent with their gender identity, the alleged injuries to A.B. and her mother are conjectural given the many ways that schools can accommodate, and have accommodated, students who desire additional privacy under Title IX.   Indeed, the 2016 DCL specifically notes that "[a] school may . . . make individual-user options available to all students who voluntarily seek additional privacy." 2016 DCL at 3.   For example, schools may provide to such students "access to a reasonable alternative, such as assignment of a student locker in near proximity to the office of a teacher or

coach; use of another private area (such as a restroom stall) within the public area; use of a nearby private area (such as a single-use facility); or a separate schedule of use." *Id.* at 7 n.15; *see also Highland Bd. of Ed. v. U.S. Dep't of Educ.*, No. 2:16-cv-524, 2016 WL 5372349, at *17 (S.D. Ohio Sept. 26, 2016) (noting that school districts have successfully accommodated privacy concerns); Report & Recommendation, *Students & Parents for Privacy v. U.S. Dep't of Educ.*, No. 16-cv-4945, ECF No. 134, slip op. at 8 (N.D. Ill. Oct. 18, 2016) (Gilbert, M.J.) (discussing a resolution agreement that provided the accommodations above, as well as installation of privacy curtains to create "private changing stations"). As another court has noted, these accommodations may "entirely mitigate any potential risk of unwanted exposure" by students who desire additional privacy. *Students & Parents for Privacy*, slip op. at 58.

Given the many options that A.B.'s school and her mother's university have for mitigating or mollifying their alleged concerns, Plaintiff's allegations of potential harm stemming from the possibility that A.B. or her mother may share a restroom or other facility with a transgender student are too speculative to support standing. *See COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1223 (10th Cir. 2016) (discussing curriculum standards adopted by the Kansas Board of Education and noting that because school districts "may alter the Standards in ways that alleviate Appellants' concerns, potential future injury from the Standards themselves is speculative and insufficient to support standing"). They also rely on a conjectural chain of events without any alleged factual basis for concluding that such events will come to pass. *See Citizen Ctr. v. Gessler*, 770 F.3d 900, 912 (10th Cir. 2014) (regarding an alleged injury-in-fact that election officials in Colorado may trace election ballots and disclose how a person voted, noting that "[f]or this risk of injury to take place, three things would need to occur: 1. At least one member would vote. 2. One of the clerks would trace that member's ballot. 3. The clerk would inquire into (and possibly reveal) the electoral choices after tracing the ballot," and concluding that "[t]his series of possibilities is too speculative to confer Article III standing").

Plaintiff also contends that A.B. and her mother fear an "increased risk of sexual assault" as a result of the 2016 DCL. *Id.* ¶ 39; *see also id.* ¶ 32. Other courts considering similar allegations have rejected such baseless speculation. *See Carcaño v. McCrory*, No. 16-cv-236, 2016 WL 4508192, at *27 (M.D.N.C. Aug. 26, 2016) ("[A]lthough Defendants argue that a preliminary injunction will thwart enforcement of such safety laws by allowing non-transgender predators to exploit the opportunity to cross-dress and prey on others, the unrefuted evidence in the current record suggests that jurisdictions that have adopted accommodating bathroom access policies have not observed subsequent increases in crime."); *Highland*, 2016 WL 52723, at *18-*19; *Students & Parents for Privacy*, slip op. at 52–53 n.24 ("There is absolutely no evidence in this record that allowing transgender high school students to use restrooms or locker rooms consistent with their gender identity increases the risk of sexual assault."). Plaintiff resists this conclusion by arguing that the 2016 DCL gives "men free and unfettered access to [women's restrooms]" by "essentially repealing the New Mexico criminal statutes that protect women in these places"—namely, New Mexico's criminal prohibitions on indecent exposure and voyeurism. Compl. ¶ 31. As discussed *infra*, however, the 2016 DCL merely sets forth ED and DOJ's interpretation of what Title IX and its implementing regulations already require and does not repeal any of New Mexico's criminal laws. *See infra* Part II.C. Rather, such laws continue to offer the same protections that they did prior to the issuance of the 2016 DCL. *See Carcaño*, 2016 WL 4508192 at *27 ("[T]here is little reason to believe that allowing the individual transgender Plaintiffs to use partitioned, multiple occupancy bathrooms corresponding with their gender identities . . . will pose any threat to public safety, which will continue to be protected by the sustained validity of [North Carolina's] peeping, indecent exposure, and trespass laws.").[4]

---

[4] Nor is it accurate that Defendants' understanding of the law requires schools to allow "any male student . . . and any male teacher, administrator, or visitor completely free, unfettered and unsupervised access to women's restrooms, locker rooms, or other areas," as Plaintiff alleges. Compl. ¶¶ 29, 36. Rather, allowing transgender students to use facilities consistent with their gender identity "is not the same as allowing all cisgender boys to use the girls' facilities or all cisgender girls to use the boys' facilities." *Students & Parents for Privacy*, slip op. at 52.

**B.**     **Plaintiff Cannot Bring Suit Under the APA Because It Does Not Challenge Any Final Agency Action**

Plaintiff's APA claims also fail as a threshold matter because they do not challenge any "final agency action." 5 U.S.C. § 704. To be final, an agency action must satisfy two requirements: (1) the decision must "mark the 'consummation' of the agency's decisionmaking process," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Plaintiff's APA challenges fail the second prong of this test. The 2016 DCL is *explicit* that it merely announces ED and DOJ's views as to the interpretation of Title IX and its regulations, and "does not add requirements to applicable law, but [rather] provides information and examples to inform recipients about how [ED and DOJ] evaluate whether covered entities are complying with their legal obligations." 2016 DCL at 1. In short, the 2016 DCL simply clarifies that ED and DOJ "treat a student's gender identity as the student's sex for purposes of Title IX and its implementing regulations." *Id*. at 2. There is no final agency action "when an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party." *AT&T Co. v. E.E.O.C.*, 270 F.3d 973, 975 (D.C. Cir. 2001); *see also Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 811 (D.C. Cir. 2006) (NHTSA's policy guidelines do not constitute final agency action even where regulated parties voluntarily complied with them to avoid the risk of an administrative enforcement action). Such is the case here.

Although the Supreme Court has, in other cases, found final agency action when the actions of an agency "[gave] rise to 'direct and appreciable legal consequences,'" *U.S. Army Corps of Eng'rs v. Hawkes Co*., 136 S. Ct. 1807, 1814 (2016) (quoting *Bennett*, 520 U.S. at 178), the 2016 DCL does nothing of the sort, specifically stating that its purpose is to announce the agency's interpretation of Title IX and its implementing regulations, and not to announce a new, binding rule. By contrast, in *Sackett v. E.P.A.*, for example, the Supreme Court deemed a compliance order issued by the EPA to be final agency action where it imposed a "legal obligation to 'restore' [the

10

plaintiffs'] property according to an agency-approved Restoration Work Plan" and "expose[d] the[m] to double penalties in a future enforcement proceeding" if they failed to do so.  132 S. Ct. 1367, 1371-72 (2012).  Similarly, in *Hawkes*, the Supreme Court found final agency action where the U.S. Army Corps of Engineers ("Corps") issued a jurisdictional determination that denied the plaintiffs a "five-year safe harbor from [civil enforcement] proceedings" by the Corps and EPA under the Clean Water Act.  136 S. Ct. at 1814.

The 2016 DCL, in contrast, creates no new legal obligations and imposes no new legal consequences.  *See Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (holding that a "Final Guidance" issued by the EPA was not final agency action because even though "regulated parties may feel pressure to voluntarily conform their behavior because the writing is on the wall about what will be needed . . . there [was] no 'order compelling the regulated entity to do anything'" (quoting *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004))).  Rather, such obligations and consequences only arise, if at all, as a result of Title IX and its implementing regulations.  *See Students & Parents for Privacy*, slip op. at 38 (holding that guidance documents issued by ED in 2014 and 2015 on this issue "detail[] what [ED] thinks Title IX means" and "do[] not provide an independent basis for an enforcement action.  Instead, any action would have to be grounded in Title IX itself.").

Indeed, if an investigation of a Title IX complaint or compliance review had resulted in an administrative finding of non-compliance, ED or DOJ could have initiated enforcement actions in the absence of the 2016 DCL.  For example, in October 2011—five years prior to the issuance of the 2016 DCL—ED and DOJ initiated a joint investigation into the Arcadia Unified School District regarding allegations that the school district was discriminating against a student because he was transgender.  *See* Letter from Anurima Bhargava and Arthur Zeidman to Dr. Joel Shawn (July 24, 2013),   https://www.justice.gov/sites/default/files/crt/legacy/2013/07/26/arcadialetter.pdf   (last visited Oct. 11, 2016).  Having expressed their view that "[a]ll students, including transgender

students . . . , are protected from sex-based discrimination under Title IX," ED and DOJ resolved the matter by entering into a resolution agreement with the school district. *See also* Letter from Arthur Zeidman to Dr. John Garcia (Oct. 14, 2014) (concluding, based on an investigation opened in November 2011, that a transgender student was being subjected to worse treatment and harassment in violation of Title IX), https://www.ed.gov/documents/press-releases/downey-school-district-letter.pdf (last visited Oct. 11, 2016).

Although these matters were resolved through resolution agreements, if voluntary compliance had not been achieved, ED or DOJ would have been able to commence enforcement proceedings—subject to judicial review—on the basis of the agencies' interpretation of Title IX and its implementing regulations, years before the 2016 DCL had been issued. *See also* Amicus Br. of United States, *G.G. v. Gloucester Cnty. Sch. Bd.*, No. 15-2056, 2015 WL 6585237 (4th Cir. 2015) (asserting ED's challenged interpretation prior to the issuance of the 2016 DCL). All the 2016 DCL did was make these preexisting legal positions more widely known. Consequently, Plaintiff does not challenge any final agency action and thus lacks standing to pursue its APA claims. *See Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1174 (10th Cir. 2000) (holding that because "Plaintiffs have failed to meet their burden of identifying a 'final agency action' . . . [they] lack the statutory standing required to bring this claim under the APA").

### C.   Plaintiff's Action Is Not Ripe for Judicial Review

Finally, Plaintiff cannot carry its burden of demonstrating that this case is ripe for judicial review. The ripeness doctrine is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33 (1998) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136,

148–49 (1967)).[5]

"In assessing whether a claim is ripe for judicial resolution, [courts] apply a functional approach under which [they] evaluate 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Farrell-Cooper Min.*, 728 F.3d at 1234–35 (quoting *Abbott Labs.*, 387 U.S. at 149). "Ordinarily, whether the issues are fit for review depends on whether the plaintiff[] challenge[s] a final agency action." *Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1093–94 (10th Cir. 2004); *see also Park Lake Res. Ltd. Liab. Co. v. U.S. Dep't of Agr.*, 197 F.3d 448, 450 (10th Cir. 1999) ("A vital aspect of the requirement that issues be fit for review is that the suit challenge 'final agency action.'"). "Even where an agency action is considered final, however, a claim may not be ripe if there is no direct, immediate effect on [the] plaintiff[]." *Friends of Marolt Park*, 382 F.3d. at 1094; *see also Texas v. United States*, 523 U.S. 296, 300 (1998) (noting that a party's claim "is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all'").

As for hardship, cases in which this element is met "generally fall into one of two categories": (1) when "the parties would have faced significant costs, financial or otherwise, if their disputes were deemed unripe for adjudication," and (2) when "the defendant had taken some concrete action that threatened to impair—or had already impaired—the plaintiffs' interests." *Utah v. U.S. Dep't of Interior*, 535 F.3d 1184, 1197–98 (10th Cir. 2008) (emphasis omitted). Where a party relies on associational standing to bring suit on the basis of alleged injuries to its members, hardship is analyzed with respect to the association, and not its members. *See, e.g.*, *Roe No. 2 v. Ogden*, 253 F.3d 1225, 1231 (10th Cir. 2001) (considering whether the Ralph Timothy Potter Chapter of the American Civil Liberties Union, which had associational standing, and its

---

[5] The Tenth Circuit has identified a number of factors that courts may consider in assessing ripeness. *See Farrell-Cooper Min. Co. v. U.S. Dep't of the Interior*, 728 F.3d 1229, 1235 (10th Cir. 2013); *id.* at 1235 n.3. All of these factors address "essentially . . . the same considerations." *Id.* at 1235 n.3 (quoting *Los Alamos Study Grp. v. Dep't of Energy*, 692 F.3d 1057, 1065 (10th Cir. 2012)).

member (a named party to the lawsuit) would endure hardship as a result of delayed review); *WildEarth Guardians v. U.S. Forest Serv.*, 828 F. Supp. 2d 1223, 1242 (D. Colo. 2011) (finding that WildEarth Guardians, which had associational standing, would incur no harm as a result of delaying environmental review).

Both prongs of the ripeness test require dismissal. As discussed above, Plaintiff does not challenge any final agency action. Rather, the 2016 DCL merely proffers ED and DOJ's interpretations of Title IX and its implementing regulations, and thus, it does not present an issue fit for judicial review. *See Truckers United for Safety v. Fed. Highway Admin.*, 139 F.3d 934, 938 (D.C. Cir. 1998) (holding that a challenge by Truckers United for Safety ("TUFS") to regulatory guidance issued by the Federal Highway Administration ("FHA") was not ripe, noting that "[t]o the extent that TUFS wishes to challenge the substance of the regulatory guidance, it must wait until the [FHA] actually applies it in a concrete factual situation; indeed, when and if the [FHA] does so, TUFS may find such application unobjectionable"). Additionally, Plaintiff's Complaint identifies no "direct, immediate effect" that the 2016 DCL will have on it, further confirming that the instant case is not ripe. *Friends of Marolt Park*, 382 F.3d at 1094.[6]

Further, Plaintiff cannot identify any hardship that it would incur if the Court were to withhold consideration. The Complaint contains no suggestion that Plaintiff will face "significant costs, financial or otherwise," if the current dispute is deemed unripe for adjudication, and Defendants have not "taken [any] *concrete action* that threatened to impair—or had already impaired—[Plaintiff's] interests." *Utah*, 535 F.3d at 1197–98. As such, the Court should alternately dismiss Plaintiff's suit as unripe.

---

[6] Plaintiff alleges that the 2016 DCL has certain effects on its members—namely, A.B. and her mother fear potential "embarrassment, humiliation, anxiety, [or] loss of personal dignity" that might arise if transgender students attend their schools and the schools permit those students to use restrooms and other facilities consistent with their gender identity, but without providing any accommodations for students who desire additional privacy, and circumstances align such that A.B. or her mother actually do share a restroom or other facility with a transgender student. Compl. ¶¶ 32, 39. As previously discussed, these effects "rest[] upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" and thus do not render this action ripe. *Texas*, 523 U.S. at 300 (quoting *Thomas v. Union Carbide Agricultural Prods. Co.*, 473 U.S. 568, 580–81 (1985)).

## II.     Plaintiff's APA Claims Should Be Dismissed for Failure to State a Claim upon Which Relief May Be Granted

Even if the Court were to conclude that it has subject matter jurisdiction, this case nonetheless should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  Plaintiff's entire case is predicated on the misguided notion that protection against discrimination "on the basis of sex" as used in Title IX *unambiguously* encompasses only protection against discrimination based on "one's genetic sex as determined by one's chromosomes, birth anatomy, gametes, and reproductive system."  Compl. at 3 n.1.  As explained below, Plaintiff's absolutist view is belied by abundant authority to the contrary, including the First, Fourth, Sixth, Eighth, Ninth, and Eleventh Circuits, which have held that the term "sex" encompasses gender identity and/or that discrimination on the basis of "sex" includes discrimination against persons whose gender identity is different than their sex assigned at birth.  And while the Tenth Circuit has held that "discrimination against a transsexual based on the person's status as a transsexual is not discrimination because of sex under Title VII," *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1221 (10th Cir. 2007), that conclusion does not dictate the outcome of this case, for reasons explained herein.  In light of the weight of authority, this Court should recognize that the term "sex" or "sex discrimination" is, at the very least, ambiguous—and, further, that ED and DOJ's interpretation is a reasonable one.

Relying on their faulty premise, Plaintiff claims that Defendants' interpretation should be set aside because it: (1) is inconsistent with the language of Title IX and its implementing regulations; (2) required notice-and-comment rulemaking; and (3) "overrides New Mexico criminal law."  Compl. ¶ 50.  Plaintiff also says that Congress "mandated" that certain spaces "shall be exclusively for use by women," as Plaintiff would define those individuals.  *Id.* ¶ 1.  Yet Plaintiff fails to identify any statutory provision that even mentions restrooms or locker rooms, much less defines who is to be considered a member of a particular sex.  The APA permits agency action to be set aside only if it is "in excess of statutory jurisdiction, authority, or limitations, or

short of statutory right"; "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; or "without observance of procedure required by law."   5 U.S.C. § 706(2)(A), (C), (D).   Contrary to Plaintiff's claims, Defendants' actions are based on a reasonable interpretation of Title IX and its implementing regulations, and do not run afoul of the APA's procedural requirements.   Nor does Plaintiff state a cognizable or plausible claim based on an alleged conflict with New Mexico state law.   Therefore, Plaintiff's APA claims should be dismissed.

### A. Defendants' Interpretation Is Consistent with Title IX and Its Implementing Regulations

Counts II, III, and IV of the Complaint rest wholly on Plaintiff's claim that Defendants' interpretation exceeds congressional authority because it "is contrary to the express terms, and plain meaning, of the statute" and, in particular, the term "sex."  Compl. ¶ 45 (Count III); *see also id.* ¶ 43 (Count II); *id.* ¶ 47 (Count IV).   Title IX's implementing regulations allow schools to "provide separate toilet, locker room, and shower facilities on the basis of sex," as long as "facilities provided for students of one sex" are "comparable to such facilities provided for students of the other sex."  34 C.F.R. § 106.33.   Neither this regulation nor Title IX itself defines "sex" or resolves how a student should be assigned to sex-segregated facilities when the various indicators of that student's sex diverge.   Defendants' interpretation resolves that question, consistent with Title IX's mandate of equal access to educational opportunities, *see* 20 U.S.C. § 1681(a), by recognizing that in order to provide transgender students access to communal facilities—and to avoid subjecting them to stigma, isolation, and discrimination—they must be allowed to use facilities that match their gender identity.   The Supreme Court has held that courts must defer to agencies' reasonable interpretations of their own ambiguous regulations.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).   The only court of appeals to consider ED's interpretation did just that.  *See G.G. v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 720 (4th Cir. 2016), *mandate recalled and stayed,*

*Gloucester Cnty. Sch. Bd. v. G.G.*, 136 S. Ct. 2442 (2016), *petition for cert. filed*, No. 16-273 (Aug. 29, 2016).[7]   A growing chorus of district courts has largely agreed.   *See Highland*, 2016 WL 5372349, at *11; *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, No. 16-cv-943, 2016 WL 5239829, at *4 (E.D. Wisc. Sept. 22, 2016); *Carcaño*, 2016 WL 4508192, at *11-16; *Students & Parents for Privacy*, slip op. at 35.[8]   These decisions show that Defendants' interpretation is not just reasonable; it is the best construction of the relevant statutory and regulatory authority.

1.   <u>Title IX and Its Regulations Are Silent as to How Transgender Students Should Be Assigned to Sex-Segregated Facilities</u>

Section 106.33—the restroom and locker room regulation at issue here—does not define "sex" or specify which sex-segregated facilities transgender students may use.   *See* 34 C.F.R. § 106.33.   Neither does the statute, which prohibits sex discrimination with limited exceptions, *see* 20 U.S.C. §§ 1681(a), 1686, but never purports to define "sex" or mandate how transgender students should be assigned to any sex-segregated facilities.   Plaintiff states that "Title IX explicitly allows institutions to provide separate facilities for men and women."   Compl. ¶ 11.   But that "straightforward conclusion" does not answer the question in this case, because the regulation remains "silent as to how a school should determine whether a transgender individual is a male or female for the purpose of access to sex-segregated restrooms."   *Gloucester*, 822 F.3d at 720.

Nor is it the case that "sex," as used in Title IX and its implementing regulations, unambiguously refers to "one's chromosomes, birth anatomy, gametes, and reproductive system," as Plaintiff claims.   Compl. at 3 n.1.   As the Fourth Circuit recently explained, dictionary

---

[7] The Fourth Circuit's decision in *Gloucester* remains good law in the Fourth Circuit despite the Supreme Court's stay pending a decision on certiorari. *See Carcaño*, 2016 WL 4508192, at *13 ("[D]espite the stay and recall of the mandate, the Supreme Court did not vacate or reverse the Fourth Circuit's decision. Thus, . . . at present [*Gloucester*] remains the law in this circuit."); *Highland*, 2016 WL 5372349, at *18 (explaining reliance on *Gloucester* despite the Supreme Court's stay).

[8] Two district courts have held otherwise. *See Texas v. United States*, No. 7:16-cv-54-O, 2016 WL 4426495 (N.D. Tex. Aug. 21, 2016); *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 682 (W.D. Pa. 2015). Multiple courts have rejected the analysis in *Johnston. See, e.g., Gloucester*, 822 F.3d at 723 n.9; *Highland*, 2016 WL 5372349, at *17; *Students & Parents for Privacy*, slip op. at 35 n.19. The decision in *Texas* is addressed *infra* at note 14.

17

definitions of "sex" contemporaneous with Title IX demonstrate "that a hard-and-fast binary division on the basis of reproductive organs—although useful in most cases—was not universally descriptive" even at that time.  *Gloucester*, 822 F.3d at 721; *see also Highland*, 2016 WL 5372349 at *11 (noting that "dictionaries from [the time when Title IX was enacted] defined 'sex' in myriad ways" and rejecting the argument that those dictionary definitions "reflect a uniform and unambiguous meaning of 'sex' as biological sex or sex assigned at birth").[9]  Modern dictionaries similarly define sex in ways that encompass multiple components, including social, psychological, and behavioral factors.  *See Gloucester*, 822 F.3d at 721 n.7 (citing modern dictionaries).

Those factors sometimes diverge.  For instance, a person who has undergone sex reassignment surgery may have genitalia that indicate a different sex from his or her chromosomes. A transgender person's gender identity does not match his or her birth-assigned sex.  An intersex person[10] may have ambiguities as to components of his or her sex.  *See id.* at 720-21 (collecting examples); *Radtke v. Misc. Drivers & Helpers Union Local No. 683 Health, Welfare, Eye & Dental Fund*, 867 F. Supp. 2d 1023, 1032 (D. Minn. 2012) ("An individual's sex includes many components, . . . some of which could be ambiguous or in conflict.").  As multiple courts have now recognized, neither Title IX nor section 106.33 purport to favor any particular component of sex over any others; the text therefore "sheds little light on how exactly to determine the 'character of being either male or female' where those indicators diverge."  *Highland*, 2016 WL 5372349, at *13 (quoting *Gloucester*, 822 F.3d at 722); *see also Radtke*, 867 F. Supp. 2d at 1032 (rejecting the

---

[9] *See, e.g.*, Am. Heritage Dictionary 548, 1187 (1973) (defining sex as "the physiological, functional, and psychological differences that distinguish the male and the female"); Webster's Third New Int'l Dictionary 2081 (1971) (defining sex as "the sum of the morphological, physiological, and behavioral peculiarities"); Webster's Seventh New Collegiate Dictionary 347, 795 (1970) (defining sex to include the "behavioral peculiarities" that "distinguish males and females").

[10] "[I]ntersexuality is a set of medical conditions that feature congenital anomaly of the reproductive and sexual system," such that "a person with an intersex condition is born with sex chromosomes, external genitalia, or an internal reproductive system that is not considered for either male or female."  *Johnson v. Fresh Mark, Inc.*, 337 F. Supp. 2d 996, 1000 n.3 (N.D. Ohio 2003).

argument that "'sex' is narrowly defined as an immutable biological determination at birth").[11]

Plaintiff maintains that Title IX's legislative history sheds light on that question, *see* Compl. ¶¶ 11-12, but nothing it cites has anything to do with the definition of sex, or the assignment of transgender students to sex-segregated facilities. All Plaintiff has shown is that legislators expected that Title IX and its regulations would allow for certain sex-segregated activities. But the permissibility of sex segregation does not help to define sex in the first place, or to determine which sex-segregated facility transgender students may use. *See Gloucester*, 822 F.3d at 720. Plaintiff has not identified legislative history about transgender students specifically. And even if it had, any argument based on the subjective intent of legislators in 1972 is foreclosed by the Supreme Court's decision in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998). There, the Court explained that "statutory prohibitions often go beyond the principal evil" in the minds of the enacting legislators "to cover reasonably comparable evils" fairly encompassed by the statutory text. *Id.* The Court therefore held that Title VII prohibited "male-on-male sexual harassment," even though that "was assuredly not the principal evil Congress was concerned with when it enacted Title VII." *Id.*[12]

Plaintiff also argues that other, later statutes should control the Court's interpretation of Title IX and its regulations. It cites the Violence Against Women Reauthorization Act of 2013 ("VAWA"), Pub. L. No. 113-4, 127 Stat. 61 (2013), which added "gender identity" alongside

---

[11] Plaintiff attempts to draw a hard distinction between biological and non-biological factors. *See, e.g.*, Compl. ¶ 15 ("Congress has repeatedly affirmed that 'sex' as used in Title IX means *only* biological sex."). But there are increasing indications that gender identity itself has biological roots. "[N]umerous medical studies conducted in the past six years . . . 'point in the direction of hormonal and genetic causes for the in utero development'" of gender identity that is inconsistent with an individual's genitalia. Christine Michelle Duffy, *The Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973*, *in* GENDER IDENTITY AND SEXUAL ORIENTATION DISCRIMINATION IN THE WORKPLACE: A PRACTICAL GUIDE, ch. 16, at 16-72 to 16-74 & n.282 (Christine Michelle Duffy ed. Bloomberg BNA 2014)); *see also* E.S. Smith et al., *The Transexual Brain—A Review of Findings on the Neural Basis of Transsexualism*, 59 NEUROSCIENCE AND BIOBEHAVIORAL REVIEWS 251-66 (Dec. 2015) (citing numerous studies and concluding that "[t]he available data from structural and functional neuroimaging-studies promote the view of transsexualism as a condition that has biological underpinnings").

[12] Courts look to case law interpreting Title VII for guidance in evaluating a claim brought under Title IX, and vice-versa. *See, e.g.*, *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999).

"sex" in its list of prohibited grounds for discrimination. *See* 42 U.S.C. § 13925(b)(13)(A); Compl. ¶ 14. But Congress's expansion of VAWA in 2013 evinced no intent to amend Title IX to withhold equivalent protections. In general, "later enacted laws . . . do not declare the meaning of earlier law," especially when "[t]hey do not reflect any direct focus by Congress upon the meaning of the earlier enacted provisions." *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) ("Consequently, we do not find in them any forward looking legislative mandate, guidance, or direct suggestion about how courts should interpret the earlier provisions."). Congress is entitled to remove uncertainty from a later statute without unwittingly revising an earlier one.

Plaintiff's invocations of failed legislative proposals are equally unpersuasive. *See* Compl. ¶¶ 15-16. "A bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001). "Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (quotation marks omitted). In any event, those legislative efforts did not address the question raised here—namely, how to determine the sex of a transgender individual for purposes of access to sex-segregated facilities under Title IX and its implementing regulations.

In sum, Plaintiff has not carried its heavy burden to establish that Title IX's regulations *unambiguously* preclude schools from considering gender identity when assigning students to communal facilities. *Cf. Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1226 (10th Cir. 2014) (explaining that a provision is "ambiguous" when it is "reasonably 'susceptible to more than one interpretation'"). This Court should therefore apply *Auer* to Defendants' interpretation.[13]

---

[13] One district court has preliminarily concluded that section 106.33 is not ambiguous and requires facilities to be segregated according to birth-assigned sex. *See Texas*, 2016 WL 4426495, at *14-15. But there are multiple problems with that court's analysis, which this Court should not follow. First, the *Texas* court relied heavily on what it assumed was "the intent of the drafter," *id.* at *14, despite the Supreme Court's clear instruction not to limit sex discrimination

2.     Defendants Reasonably Interpreted Title IX's Implementing Regulations Consistent with the Statute's Mandate of Equal Educational Opportunities

Because Title IX and its implementing regulations are not unambiguous in the manner that Plaintiff claims, Counts II, III, and IV should be dismissed.  ED and DOJ's interpretation of the regulations implementing Title IX regarding sex-segregated facilities is entitled to deference, and their interpretation of what constitutes discrimination on the basis of sex is the best and most reasonable construction of Title IX and its implementing regulations.

An agency's interpretation of its own ambiguous regulation is controlling as long as it is not "plainly erroneous or inconsistent with the regulation."  *Auer*, 519 U.S. at 461.  Two courts have considered whether ED's resolution of any ambiguity was reasonable, and both courts concluded that it was.  *See Gloucester*, 822 F.3d at 721-23; *Highland*, 2016 WL 5372349, at *13 ("The agencies easily satisfy this deferential standard.").  This Court should as well.  Defendants' interpretation is consistent with those of numerous other federal agencies.  *Gloucester*, 822 F.3d at 722-23.  ED has never taken a definitive position to the contrary.[14]  And while its present interpretation is fairly new, "novelty alone is no reason to refuse deference."  *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 64 (2011).  As in *Talk America*, "the issue in th[is] case[] did not

laws to "the principal concerns of our legislators."  *Oncale*, 523 U.S. at 79-80.  The court did not discuss *Oncale* or mention any legislative history discussing transgender people that would indicate an intent to exclude them from statutory protection against sex discrimination.  Second, while acknowledging that "the use of dictionary definitions is appropriate in interpreting undefined statutory terms," *Texas*, 2016 WL 4426495, at *14, the court did not mention, analyze, or distinguish the numerous dictionaries that have defined sex to include behavioral and social factors like gender identity.  *See, e.g.*, *Gloucester*, 822 F.3d at 721 & n.7; *Highland*, 2016 WL 5372349, at *11 & n.4.  Third, the court did not address the many ambiguities created by defining sex based on genitalia alone, or the evidence that gender identity has biological roots.  *See Gloucester*, 822 F.3d at 720-21.  Fourth, the court relied on the fact that section 106.33 is binary (i.e., it speaks of "one sex" and "the other sex"), *see Texas*, 2016 WL 4426495, at *15, without explaining how that fact alone could determine, unambiguously, how transgender students should be assigned to sex-segregated facilities.  Indeed, two other courts have since expressed disagreement with that court's reasoning.  *See, e.g.*, *Highland*, 2016 WL 5372349, at *7 ("The *Texas* court's analysis can charitably be described as cursory . . . ."); *Students & Parents for Privacy*, slip op. at 4 ("In *Texas*, the court decided DOE's interpretation should not be given deference based on a relatively conclusory analysis that this Court finds unpersuasive.").

[14] Although DOJ revised its defensive litigating position on the scope of Title VII, this change was made in response to adverse court decisions rejecting DOJ's previous litigating position, as well as evolving case law.  *See* Memorandum from Attorney General Eric Holder (Dec. 15, 2014), https://www.justice.gov/file/188671/download (last visited Oct. 6, 2016); *Schroer v. Billington*, 577 F. Supp. 2d 293, 306-08 (D.D.C. 2008).

arise until recently," as school districts began to seek ED's guidance on how to assign transgender students to sex-segregated facilities under the Title IX regulations. *Id.* Nor could Plaintiff plausibly argue that Defendants' interpretation represents "a convenient litigation position or a *post hoc* rationalization." *Highland*, 2016 WL 5372349, at *13 (citing *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-67 (2012)). Thus, if the Court concludes that section 106.33 does not provide an unambiguous answer as to which facilities transgender students must use, there is no reason to withhold *Auer* deference.

ED and DOJ's interpretation of section 106.33 is rooted in Title IX's overriding concern for equal access to educational opportunities. Under Title IX, "[s]tudents are not only protected from discrimination, but also specifically shielded from being 'excluded from participation in' or 'denied the benefits of' any 'education program or activity receiving Federal financial assistance.'" *Davis*, 526 U.S. at 650 (quoting 20 U.S.C. § 1681(a)); *see also* 34 C.F.R. § 106.31(b). Consistent with this broad prohibition, schools can separate facilities such as restrooms and locker rooms, *see, e.g.*, 34 C.F.R. § 106.33, but they may only do so within the narrow confines of the regulation. *See Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 175 (2005) ("Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition."). Interpreting that exception consistent with Title IX "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81.

After multiple years of studying this issue in consultation with school administrators and transgender students, among others, ED concluded that preserving transgender students' access to communal facilities required that they have access to the facilities that matched their gender identity. *See, e.g.*, Resolution Agreement, *In re Dorchester Cnty. Sch. Dist. 2, SC*, OCR Case No. 11-15-1348 (Jun. 16, 2016) (one-year investigation); Resolution Agreement, *Township High School Dist. 211, IL*, OCR Case No. 05-14-1055 (Dec. 3, 2015) (two-year investigation);

Resolution Agreement, *Central Piedmont Cmty. College, NC*, OCR Case No. 11-14-2265 (Aug. 13, 2015) (one-year investigation); Resolution Agreement, *In re Downey Unified Sch. Dist., CA*, OCR Case No. 09-12-1095 (Oct. 8, 2014) (three-year investigation); Resolution Agreement, *Student v. Arcadia Unified Sch. Dist., CA*, OCR Case No. 09-12-1020/DOJ Case Number 169-12C-70 (Jul. 24, 2013) (two-year investigation).  As this case and others attest, using the facilities that *conflict* with their gender identity is not a meaningful option for most transgender people.  A transgender female student who lives as a girl, dresses and presents as a girl, and who is perceived by others to be a girl, cannot reasonably be expected to use the boys' restroom.  ED's interpretation ensures that transgender students can use communal facilities, and that they are not subject to the daily stigma of a school negating their "very identity."  *See Lusardi v. McHugh*, No. 0120133395, 2015 WL 1607756, at *10 (E.E.O.C. Apr. 1, 2015) (explaining why denying a transgender woman access to the women's restroom denied her "equal status, respect, and dignity").  ED reached this conclusion through investigations, collaboration with school administrators, and decades of experience with on-the-ground realities in schools.  *See, e.g.*, U.S. Dep't of Educ., *Examples of Policies and Emerging Practices for Supporting Transgender Students* (May 2016) ("*Emerging Practices*"), http://www.ed.gov/oese/oshs/emergingpractices.pdf (last visited Oct. 6, 2016).  Its conclusions "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance" under any level of deference.  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see id.* at 139 (affording greater deference to agency interpretations "made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case").  ED's experience is crucial in assessing the "constellation of surrounding circumstances" necessary to preserve equal access to school programs.  *Oncale*, 523 U.S. at 82.

Moreover, the Tenth Circuit's decision in *Etsitty v. Utah Transit Authority*, 502 F.3d 1215 (10th Cir. 2007), does not control the outcome here.  In *Etsitty*, the court concluded that

"transsexuals are not a protected class under Title VII," and thus Title VII does not prohibit discrimination based on transgender status.  *Id.* at 1220.  The court assumed without deciding, however, that a transgender individual *could* state a claim based on a failure to conform to sex stereotypes, as in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), discussed below.  *Etsitty*, 502 F.3d at 1223-24; *see also Hiatt v. Colo. Seminary*, No. 15-cv-192, 2016 WL 1321511, at *7 (D. Colo. Apr. 5, 2016).  The Tenth Circuit rejected this claim in *Etsitty* because the plaintiff based her claim "solely on her status as a biological male"—that is, she did "not claim protection under Title VII as a woman who fails to conform to social stereotypes about how a woman should act and appear."   502 F.3d at 1223 n.3.   Therefore, the court concluded that "an employer's requirement that employees use restrooms matching their biological sex does not expose biological males to disadvantageous terms and does not discriminate against employees who fail to conform to gender stereotypes."  *Id.* at 1225.  But the *Etsitty* court had no occasion to answer the question presented here of whether a transgender female should be treated as a woman for purposes of access to sex-segregated facilities in educational institutions.   And the court's logic does not foreclose the possibility that a transgender woman who is denied access to women's facilities is subject to discrimination because she is treated differently based on the fact that her gender identity differs from her sex assigned at birth.  *See United States v. Se. Okla. State Univ.*, No. 15-324-C, 2015 WL 4606079, at *2 (W.D. Okla. July 10, 2015) ("Here, it is clear that Defendants' actions as alleged by Dr. Tudor occurred because she was female, yet Defendants regarded her as male.").  As explained above, ED has considered this issue in the context of schools and Title IX, and has concluded that transgender students are subject to discrimination when they are denied access to sex-segregated facilities consistent with their gender identity.  That conclusion is based on "careful consideration of the social context in which particular behavior occurs and is experienced by its

24

target," *Oncale*, 523 U.S. at 81, and is not undermined by *Etsitty*,[15] which was decided in a very different context.[16]

Indeed, courts have long recognized that federal protections against sex discrimination extend beyond discrimination motivated simply by the victim's genitalia or chromosomes. Since

---

[15] Defendants also believe that *Etsitty* was wrongly decided in a number of respects. In particular, while the Tenth Circuit relied on *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984); *Sommers v. Budget Marketing, Inc.*, 667 F.2d 748 (8th Cir. 1982); and *Holloway v. Arthur Anderson & Co.*, 566 F.2d 659 (9th Cir. 1977), *see Etsitty*, 502 F.3d at 1221, "federal courts have recognized with near-total uniformity that 'the approach in *Holloway*, *Sommers*, and *Ulane* . . . has been eviscerated' by *Price Waterhouse*." *Glenn v. Brumby*, 663 F.3d 1312, 1318 n.5 (11th Cir. 2011) (quoting *Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004)); *see also Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000) (explaining that "[t]he initial judicial approach" in cases like *Ulane*, *Sommers*, and *Holloway* was "overruled by the logic and language of *Price Waterhouse*"). Indeed, the Tenth Circuit cited *Holloway* even though the Ninth Circuit had already recognized that it had been abrogated by the Supreme Court. *See Schwenk*, 204 F.3d at 1201. Neither the reasoning nor the conclusion of *Etsitty* can be reconciled with *Oncale* and *Price Waterhouse*. While the Tenth Circuit recognized that "it is the plain language of the statute and not the primary intent of Congress that guides our interpretation of Title VII," the court nonetheless relied on the absence of legislative history "to support the conclusion that the plain meaning of 'sex' encompasses [nothing] more than male and female." *Etsitty*, 502 F.3d at 1221-22. But Congress showed no greater intention to protect males from harassment by other males, or to prohibit discrimination based on the failure to conform to gender-based behavioral norms, and yet the Supreme Court has since held that both are covered. *See Oncale*, 523 U.S. at 79; *Price Waterhouse*, 490 U.S. at 242. Furthermore, the Tenth Circuit emphasized that its decision was made "[a]t this point in time and with the record and arguments before" it, and recognized that "[s]cientific research may someday cause a shift in the plain meaning of the term 'sex' so that it extends beyond the two starkly defined categories of male and female." *Etsitty*, 502 F.3d at 1222. That day has come. *See supra* note 11. As the Fourth Circuit held in *Gloucester* when it acknowledged "the varying physical, psychological, and social aspects—or, in the words of an older dictionary, 'the morphological, physiological, and behavioral peculiarities—included in the term 'sex,'" the plain meaning of "sex" cannot be reconciled with the Tenth Circuit's narrow and now outdated view. 822 F.3d at 722.

[16] Count IV of the Complaint alleges that the 2016 DCL is "arbitrary and capricious" because "there is no factual record or other basis from which Defendants could conclude that 'sex' is the same as 'gender identity.'" Compl. ¶ 47. This claim largely rehashes the claim that Defendants have misinterpreted Title IX and its implementing regulations. But it is also clear on the face of the 2016 DCL that ED and DOJ conducted a reasoned analysis, including express consideration of privacy issues, and balanced them against the important need to protect transgender students from discrimination on the basis of sex. *See, e.g.*, 2016 DCL at 3 (providing that "[a] school may [] make individual-user options available to all students who voluntarily seek additional privacy"). ED adopted its interpretation in consultation with school districts and administrators. Based on its practical experience, it concluded that schools do not have to deny transgender students equal access to school facilities in order to protect privacy and prevent disruption. *See, e.g.*, Emerging Practices (describing how schools have successfully implemented practices that align with ED's interpretation). School administrators across the country have agreed. *See, e.g.*, Amicus Br. of Sch. Admins., *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, No. 2:16-cv-524, ECF No. 91-1 (S.D. Ohio). Indeed, the Fourth Circuit recognized that Defendants' interpretation reflects the agencies' "fair and considered judgment" on policy formulation, not "merely a convenient litigating position," *Gloucester*, 822 F.3d at 722-23, and accords with "the weight of circuit authority concluding that discrimination against transgender individuals constitutes discrimination 'on the basis of sex' in the context of analogous statutes," *id.* at 727 (Davis, J., concurring). Finally, the documents at issue merely interpret existing legal requirements. Issuance of such interpretive guidance does not obligate an agency to proffer the type of policy explanation required in notice-and-comment rulemaking. *See infra* Section II.B.

the Supreme Court's decision in *Price Waterhouse*, it has been clear that discrimination "because of . . . sex" extends to the *behavioral and social aspects of sex*: "sex-based considerations," in the Supreme Court's words.  490 U.S. at 240, 242 (quoting 42 U.S.C. § 2000e-2(a)(1)).  In *Price Waterhouse*, the Court held that an employer engaged in sex discrimination when it failed to promote an employee because of "her failure to conform to certain gender stereotypes."  *Id.* at 272. The Court rejected the notion that sex discrimination occurs only in situations in which an employer prefers a man over a woman (or vice versa); rather, a prohibition on sex discrimination encompasses any differential treatment based on "sex-based considerations."  *Id.* at 242.

Applying *Price Waterhouse* in the context of transgender employees, the overwhelming majority of the circuits to have considered this issue have concluded that discrimination because of "sex" in Title VII includes discrimination against persons whose gender identity is different from their birth-assigned sex.  Indeed, as Judge Davis recognized in *Gloucester*, the "weight of circuit authority" recognizes that "discrimination against transgender individuals constitutes discrimination 'on the basis of sex'" under Title IX and "analogous statutes," including Title VII. *Gloucester*, 822 F.3d at 727 (Davis, J., concurring); *see also Glenn*, 663 F.3d at 1330-21; *Smith*, 378 F.3d at 575; *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215 (1st Cir. 2000); *Schwenk*, 204 F.3d at 1201–02; *Schroer*, 577 F. Supp. 2d at 306–08.  These courts have held that "discrimination against a plaintiff who is a transsexual—and therefore fails to act and/*or identify* with his or her gender—is no different from the discrimination directed against Ann Hopkins in *Price Waterhouse*."  *Smith*, 378 F.3d at 575 (emphasis added).  As the Eleventh Circuit has explained, "[t]he very acts that define transgender people are those that contradict stereotypes of gender-appropriate appearance and behavior."  *Glenn*, 663 F.3d at 1318 (quotation marks omitted). "There is thus a congruence between discriminating against transgender and transsexual individuals and discrimination on the basis of gender-based behavioral norms."  *Id.* at 1316; *see also Schwenk*, 204 F.3d at 1202 (rejecting pre-*Price Waterhouse* cases that failed to apply Title

26

VII to discrimination based on a person's "sexual identity").

Plaintiff's insistence that students may be treated unequally based on any consideration other than "genetic sex as determined by one's chromosomes, birth anatomy, gametes, and reproductive system," Compl. at 3 n.1, is inconsistent with *Price Waterhouse* and those cases that have applied it in the context of discrimination against transgender individuals. Plaintiff's view would mean, for example, that a school could legally discriminate against a transgender female student because her sex assigned at birth does not match her internal identification or presentation of gender to the outside (*i.e.*, because she wears women's clothing, has a woman's hairstyle, has developed breasts or other bodily features through hormone therapy, among other things). On Plaintiff's reading of the statute, she still could be adversely treated based on the school's notion that she is "not woman enough." Discrimination on the basis of such "sex-based considerations" is clearly proscribed by *Price Waterhouse*. 490 U.S. at 242.

By contrast, Defendants' interpretation is rooted in the understanding that, after *Price Waterhouse*, "'sex' under Title VII encompasses *both* the anatomical differences between men and women *and* gender." *Schwenk*, 204 F.3d at 1202 (emphasis added). In other words, "sex" in the civil rights laws includes "sex as viewed as social rather than biological classes." *Smith*, 378 F.3d at 572 (quotations omitted); *see also Schwenk*, 204 F.3d at 1201 (rejecting pre-*Price Waterhouse* cases for "construing 'sex' in Title VII narrowly to mean only anatomical sex rather than gender"). Defendants' interpretation ensures that transgender students are not subject to differential treatment, including access to facilities, because of such sex-based considerations—namely, their transgender status. Such a practice would "literally discriminat[e] 'because of . . . sex,'" *Schroer*, 577 F. Supp. 2d at 308, whether viewed as discrimination based on a divergence between gender identity and one's sex assigned at birth or as discrimination because of an individual's gender transition. As the *Schroer* court aptly analogized, firing an employee because she converts from Christianity to Judaism "would be a clear case of discrimination 'because of religion,'" even if the

employer "harbors no bias toward either Christians or Jews but only 'converts,'" as "[n]o court would take seriously the notion that 'converts' are not covered" by a prohibition against religious discrimination.  *Id.* at 306.  By the same logic, discrimination against people because they have "changed" their sex—*i.e.*, persons living as a different sex than the one assigned at birth—is a "clear case" of discrimination because of sex.  *Id.*

**B.**     **The 2016 DCL Is An Interpretive Rule Exempt from Notice-and-Comment Rulemaking**

Plaintiff alleges that the 2016 DCL "is final agency action in the form of a legislative rule that Defendants adopted without the notice and comment procedures required by" the APA.  Compl. ¶ 41 (Count I).  As previously explained, the 2016 DCL is not final agency action.  Nor is it a legislative rule.  Rather, the 2016 DCL at most constitutes an interpretive rule that does not require notice-and-comment rulemaking.  Plaintiff's procedural APA claim thus fails on its face.

The APA does not require agencies to follow notice-and-comment procedures in all situations, or even for all "rules."  Rather, the statute specifically excludes interpretive rules and statements of agency policy from these procedures.  5 U.S.C. § 553(b)(3)(A); *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015).  The Supreme Court has explained that the "critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'"  *Perez*, 135 S. Ct. at 1204; *see also Sorenson Commc'ns, Inc. v. F.C.C.*, 567 F.3d 1215, 1222-23 (10th Cir. 2009).  Interpretive rules encourage predictability in the administrative process because they "clarify or explain existing laws or regulations."  *Nat'l Med. Enters., Inc. v. Shalala*, 43 F.3d 691, 697 (D.C. Cir. 1995).  An agency that enforces "less than crystalline" statutes and regulations must interpret them, "and it does the public a favor if it announces the interpretation in advance of enforcement, whether the announcement takes the form of a rule or of a policy statement, which the [APA] assimilates to an interpretive rule."  *Hoctor v. USDA*, 82 F.3d 165, 167 (7th Cir. 1996).  Courts should not

"discourage the announcement of agencies' interpretations by burdening the interpretive process with cumbersome formalities." *Id.* Here, by announcing their interpretation of Title IX and its regulations, ED and DOJ have informed the public about their understanding of the law—and no more. The 2016 DCL is not binding on courts, does not carry the force and effect of law, and does not add substantively to existing laws, but simply "advise[s] the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995). The 2016 DCL is therefore a paradigmatic interpretive rule, exempt from the notice-and-comment requirements of the APA. *Id.*

Plaintiff incorrectly argues that the 2016 DCL is a substantive rule under the APA. Compl. ¶ 41. That is simply not so. First, unlike the statute and regulations on which it is premised, the interpretation itself does not carry the force of law. Rather, as explained above, it merely explains what ED and DOJ think Title IX and its implementing regulations *already* require. Although ED and DOJ's interpretation of the law is entitled to some deference, courts will not enforce it if they believe the agencies' "interpretation of the meaning" of the statute or regulations is inconsistent with the statute or regulations themselves. *E. Ky. Welfare Rights Org. v. Simon*, 506 F.2d 1278, 1290 (D.C. Cir. 1974), *vacated for lack of standing*, 426 U.S. 26 (1976); *see also Perez*, 135 S. Ct. at 1208 n.4 (explaining that *Auer* deference does not transform an interpretive rule into a legislative rule). Valid interpretations of binding authorities necessarily implicate rights and obligations— which derive from underlying statutes and rules—but the binding nature of an interpreted statute or regulation does not transform an agency's explication into a legislative rule. If that were so, "every interpretive rule would become legislative." *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 681 (6th Cir. 2005).

Second, the 2016 DCL does not impose new obligations on Plaintiff (or anyone else, for that matter). To the contrary, it simply provides an interpretation of the applicable statute and regulations for a context that perhaps had not arisen previously. As the Fourth Circuit explained,

for most of their existence, Title IX's regulations were understood simply to mean that a school may provide sex-segregated facilities. *See Gloucester*, 822 F.3d at 722. In recent years, as schools have confronted the reality that some students' gender identities do not align with their birth-assigned sex, schools have begun to look to ED for guidance as to how its regulations apply to transgender students—*i.e.*, how Title IX's prohibition on discrimination on the basis of sex operates in the context of providing sex-segregated facilities in schools for transgender students. *Id.* at 720. It was also only recently that schools started citing Title IX's regulations as the basis for excluding transgender students from facilities consistent with their gender identity. *Id.* The 2016 DCL thus simply applies preexisting rules to new circumstances, supplying "crisper and more detailed lines than the authority being interpreted."[17] *Iowa League of Cities v. EPA*, 711 F.3d 844, 875 (8th Cir. 2013); *see also Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). Accordingly, it is an interpretive rule, which is not subject to notice-and-comment requirements.

## C. The 2016 DCL Does Not Conflict With New Mexico Criminal Law

Plaintiff also bases its APA claim on an alleged conflict with New Mexico state law. *See* Compl. ¶¶ 49-50 (Count V). As an initial matter, this claim is duplicative of Plaintiff's other APA claims, and fails for the same reason. Plaintiff cites 5 U.S.C. § 706(2)(C), *see* Compl. ¶ 50, which applies to agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." If Defendant's interpretation of Title IX and its implementing regulations is correct, then Defendants have taken no action in excess of their statutory authority, even if there is some conflict with state law (which, as explained below, there is not). *Cf. WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 683 (10th Cir. 2015) (applying 5 U.S.C. § 706(2)(C)).

In any event, the 2016 DCL does not "repeal[]" or "override[]" New Mexico's criminal

---

[17] Even were the Court to construe the 2016 DCL as a change in the agencies' interpretation of the law—which it should not—a changed interpretation is no more subject to notice-and-comment requirements than an agency's initial interpretation. *See Perez*, 135 S. Ct. at 1206.

prohibitions on indecent exposure and voyeurism.  Compl. ¶¶ 31, 50.  The statutes' prohibitions do not turn on the gender of the individual perpetrator or victim—in other words, they apply equally to a man in a woman's restroom and to a woman in a woman's restroom (whether or not the individual is transgender).  *See* N.M.S. § 30-9-14 (indecent exposure); *id.* § 30-9-20 (voyeurism).  Thus, a transgender woman in a woman's restroom, locker room, or other sex-segregated facility is still subject to these laws, as is any other woman, and the laws continue to offer the same protections that they did prior to the issuance of the 2016 DCL.  *See Carcaño*, 2016 WL 4508192 at *27 ("[T]here is little reason to believe that allowing the individual transgender Plaintiffs to use partitioned, multiple occupancy bathrooms corresponding with their gender identities . . . will pose any threat to public safety, which will continue to be protected by the sustained validity of [North Carolina's] peeping, indecent exposure, and trespass laws.").

## III.    The 2016 DCL Does Not Violate Students' Constitutional Right to Bodily Privacy

Finally, Plaintiff argues that in issuing the 2016 DCL, "Defendants have violated the Fifth Amendment's guarantee of the fundamental right to bodily privacy and are compelling the State of New Mexico to violate the Fourteenth Amendment's guarantee of the fundamental right to bodily privacy."  Compl. ¶ 53.  In doing so, Plaintiff invokes substantive due process guarantees contained in the Fifth and Fourteenth Amendments, which "protect[] fundamental liberty interests and protect[] against the exercise of government authority that 'shocks the conscience.'"  *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 749 (10th Cir. 2013) (quoting *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008)).

Under Tenth Circuit case law, analyzing a substantive due process claim is a four-step process.  First, a court must "make a 'careful description' of the allegedly violated right."  *Browder v. City of Albuquerque*, 787 F.3d 1076, 1078 (10th Cir. 2015) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)); *see also Chavez v. Martinez*, 538 U.S. 760, 775–76 (2003) ("*Glucksberg* requires a 'careful description' of the asserted fundamental liberty interest for the

purposes of substantive due process analysis; vague generalities, such as 'the right not to be talked to,' will not suffice.").[18]   A court then asks "whether that right counts as a 'fundamental' one, a limited class of rights sometimes described by the Court as those that can fairly claim to be 'objectively, deeply rooted in this Nation's history and tradition.'"  *Browder*, 787 F.3d at 1078 (quoting *Glucksberg*, 521 U.S. at 720-21).   Next, a court considers "whether the government's alleged infringement of the right in question was 'direct[]' and 'substantial[].'"  *Id.* (quoting *Zablocki v. Redhail*, 434 U.S. 374, 387 (1978)).  Only if the plaintiff's alleged injury satisfies these requirements does a court then "assess whether the government can muster sufficient justification for its actions."  *Id.*

Plaintiff's substantive due process claim fails at every stage of this analysis.  Plaintiff characterizes the right at issue as a "fundamental right to bodily privacy."  Compl. ¶ 53.  This description, however, fails to narrowly and accurately define the interest that Plaintiff actually seeks to vindicate, which is a purported right of some students to use sex-segregated facilities from which transgender students are excluded.  No court in this circuit has recognized such a right, and this Court should not be the first.[19]  *See also Students & Parents for Privacy*, slip op. at 4 ("High

---

[18] For example, in *Glucksberg*, a case challenging Washington's ban on assisted suicide, the Supreme Court refused to characterize the interest at stake as the "right to die" or "the right to choose a humane, dignified death"; instead, the Court narrowly phrased the question as "whether the 'liberty' specially protected by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so."  521 U.S. at 722–23.  Similarly, in *Reno v. Flores*, a case involving juvenile aliens challenging regulations governing their detention on due process grounds, the Court rejected several asserted fundamental rights, such as the right of "freedom from physical restraint" and the "right of a child to be released from all other custody into the custody of its parents, legal guardian, or even close relatives."  507 U.S. 292, 302 (1993).  Instead, the Court narrowly characterized the right as "the right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution."  *Id.*

[19] To be sure, the Tenth Circuit has recognized that prisoners and detainees "retain a limited constitutional right to bodily privacy" in the context of the Fourth Amendment.  *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995); *see also Chasteen v. Black*, No. 14-CV-02235-BNB, 2014 WL 5448702, at *3 (D. Colo. Oct. 27, 2014); *Cox v. Denning*, No. 12-2571-DJW, 2014 WL 4843951, at *11 (D. Kan. Sept. 29, 2014); *Rivera v. Bates*, No. CIV 12-0473 JB/RHS, 2014 WL 3421050, at *53 (D.N.M. June 21, 2014); *Collins v. Correct Care Sols.*, No. 11-3151-SAC, 2013 WL 2458502, at *6 (D. Kan. June 6, 2013); *Jones v. Harrison*, 864 F. Supp. 166, 169 (D. Kan. 1994).  But Plaintiff neither proffers any claim under the Fourth Amendment, nor alleges any conduct that would implicate the Fourth Amendment.

school students do not have a constitutional right not to share restrooms or locker rooms with transgender students . . . ."). "[A]s the [Supreme] Court made clear in *Glucksberg*, '[not] all important, intimate, and personal decisions are . . . protected [by substantive due process].'" *Seegmiller*, 528 F.3d at 771 (quoting *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007)). Indeed, "'the list of fundamental rights is short,'" as the Supreme Court has, to date, "recognized fundamental liberty interests to consist primarily of those relating to marriage, family life, child rearing, and reproductive choices." *Id.* at 770 (quoting *Does*, 507 F.3d at 964). The Supreme Court has further cautioned that "[t]he lack of any 'guideposts for responsible decisionmaking' in this area, and our oft-stated reluctance to expand the doctrine of substantive due process, further counsel against recognizing a new 'fundamental liberty interest.'" *Chavez*, 538 U.S. at 776.

Furthermore, even if the 2016 DCL somehow implicated a fundamental right to bodily privacy—which it does not—the 2016 DCL does not interfere directly or substantially with such a right. *See Students & Parents for Privacy*, slip op. at 53 (rejecting the argument that ED and DOJ's interpretation of Title IX directly or substantially infringes on students' bodily privacy rights); *see also Christensen v. Cnty. of Boone*, 483 F.3d 454, 463 (7th Cir. 2007) ("The Constitution prevents fundamental rights from being aimed at; it does not, however, prevent side effects that may occur if the government is aiming at some other objective."). Indeed, Plaintiff frames its concern not as forced exposure by its members to individuals of the opposite sex, but as merely that A.B. and her mother fear the possibility that they may have to share locker rooms and other "intimate spaces with [transgender individuals] while in various stages of undress." Compl. ¶¶ 32, 39. Such a risk does not amount to a violation of substantive due process rights, particularly where schools and universities can and have provided accommodations to students desiring additional privacy, which may mitigate or eliminate such fears. *See supra* Part I.A.

Finally, in issuing the 2016 DCL, ED and DOJ clearly possessed a "reasonable justification in the service of a legitimate governmental objective," *Browder*, 787 F.3d at 1078–79 (quoting

33

*County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)), as the guidance provides schools and school districts an understanding of ED and DOJ's interpretation of statutory and regulatory requirements, and thereby helps protect the right of all students to receive an education in an environment free from discrimination.  Certainly, the 2016 DCL bears no similarity to the circumstances presented in other school-related cases where courts have found the type of conscience-shocking government action that contravenes the constitution.  *Compare Garcia by Garcia v. Miera*, 817 F.2d 650, 658 (10th Cir. 1987) (conscience shocking behavior where nine-year-old student was held up by her ankles and hit with a split board several times on her legs until they bled, leaving a permanent scar), *with Abeyta by & through Martinez v. Chama Valley Indep. Sch. Dist., No. 19*, 77 F.3d 1253, 1258 (10th Cir. 1996) (no conscience shocking behavior where teacher called twelve-year-old student a prostitute for a month and a half), *and Gilliam v. USD No. 244 Sch. Dist.*, 397 F. Supp. 2d 1282, 1288 (D. Kan. 2005) (no conscience shocking behavior where male teacher stared at female student, inappropriately put his arm around her, approached her from behind and pressed his torso into her back, and gave her chocolates, candies, a handwritten card, and poems).  Therefore, Count VI of the Complaint should be dismissed.

## CONCLUSION

For the reasons stated, Defendants respectfully request that the Court dismiss all of Plaintiff's claims for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

Dated: October 24, 2016                    Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

SHEILA M. LIEBER
Deputy Director, Federal Programs Branch

34

*/s/ Benjamin L. Berwick*
BENJAMIN L. BERWICK (MA Bar No. 679207)
JASON LEE (CA Bar No. 298140)
Trial Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
1 Courthouse Way, Suite 9200
Boston, MA 02210
Telephone: (617) 748-3129
Facsimile: (617) 748-3965
Email: Benjamin.L.Berwick@usdoj.gov

*Counsel for Defendants*